# EXHIBIT A

1   Anya Fuchs, Esq. (State Bar # 215105)
2   **BULLOCK LEGAL GROUP LLC**
    2000 Powell Street, Suite 825
3   Emeryville, CA 94608
    (833) 853-4258 (P) / (470) 412-6708 (F)
4   anya@bullocklegalgroup.com
    efilings@bullocklegalgroup.com
5
6   Robert C. Hillard, Esq. (*Pro Hac Vice forthcoming*)
    Alex Hilliard, Esq. (*Pro Hac Vice forthcoming*)
7   Bonnie Rickert, Esq. (*Pro Hac Vice forthcoming*)
    **HILLIARD LAW**
8   719 S. Shoreline Blvd.
    Corpus Christi, TX  78401
9   (361) 882-1612 (P) / (361) 882-3015 (F)
    bobh@hilliard-law.com
10  alex@hilliard-law.com
    brickert@hilliard-law.com
11
12  *Attorneys for Plaintiff,*
    *Rickell Mathews as Guardian ad Litem*
13  *and on behalf of X.E., a minor*

14          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                  **COUNTY OF SAN MATEO**

16                  (UNLIMITED JURISDICTION)

17  RICKELL MATHEWS, as Guardian ad Litem       Case No: 25-CIV-07479
18  and on behalf of X.E., a minor,
                                                 **COMPLAINT FOR DAMAGES**
19                              Plaintiff,
                                                 1.   **Strict Liability**
20              vs.                              2.   **Negligence**
                                                 3.   **Common Law Negligence**
21  ROBLOX CORPORATION;  and the FIRST          4.   **False Representation**
22  DOE through ONE HUNDREDTH DOE,              5.   **Intentional Tort (Fraudulent Deceit,**
    inclusive,                                       **Deceit, Concealment)**
23                              Defendants.     6.   **Punitive Damages**
24
                                                 **DEMAND FOR JURY TRIAL**
25
26
27
28

                                  1

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON        9/24/2025
By        /s/ Carl Saffold
                Deputy Clerk

## COMPLAINT

1.     Plaintiff, minor child X.E., via their Guardian ad Litem, RICKELL MATHEWS, brings this action for personal injuries against the above-captioned **DEFENDANTS** (hereinafter collectively referred to as "**DEFENDANTS**") to recover damages, pursuant to and under the laws of the State of California, arising from the severe injuries sustained by each because of Plaintiff X.E.'s use of **DEFENDANTS'** video gaming products. Plaintiff, therefore, now alleges as follows:

## INTRODUCTION

2.     Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

3.     This action seeks to hold the **DEFENDANTS** accountable for causing and contributing to a public health crisis, amounting to a global epidemic, wherein minors suffer from addiction[1] or disordered compulsion to **DEFENDANTS'** addictive and unreasonably dangerous gateway video gaming products.

4.     The products at issue consist of Roblox video gaming product that were and/or are used by X.E., including the patent-protected technologies of addictive design features incorporated therein (hereinafter collectively referred to as the "Products"), via Roblox's online app downloaded on one or more phones or gaming systems.

5.     The Products include and incorporate mechanisms of operant conditioning, a form of behavioral manipulation that uses a system of rewards and punishments to influence behavior that targets the users' dopamine receptors and causes users to hyperfocus on using and overusing the Products.  The operant conditioning incorporated into the Products (along with illegally retained

---

[1] Addiction, as defined in the seminal article *Addictive behaviors: Etiology and Treatment,* published by the American Psychological Association in its 1988 *Annual Review of Psychology*, is:

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

and/or obtained personal information of the users/players) work in conjunction with one another and with microtransactions to market Roblox, and specifically its virtual currency.

6.    These Products are marketed as and serve as "gateway" video gaming products for minors in that they serve to introduce minors to video gaming and the addictive mechanisms found within **DEFENDANTS'** Products.

7.    The addiction and/or disordered compulsion to using the Products causes profound harm, triggering an extraordinary sequela of catastrophic and life-altering injuries to users and their families.

8.    The Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to cause users, specifically minors, to become psychologically addicted[2] to using, or to develop a disordered compulsion to using, video game products, specifically **DEFENDANTS'** Products.

9.    **DEFENDANTS** failed to provide any warning to the users of the Products, or their caregivers, of the harm posed by using the Products, resulting in extraordinary detriment to users and their caregivers, including Plaintiff herein.

10.    The harm manifests in physical, emotional, mental, and financial damage to users and their families.

11.    **DEFENDANTS** have implemented in-game monetization schemes, particularly microtransactions, which are fueled by operant conditioning and other methodologies designed to target users' dopamine receptors.

12.    These schemes trigger users' desire to hyperfocus on using the Products more frequently and extensively, thereby spending increasing amounts of real money within the Products.

13.    The defective and unreasonably dangerous nature of the Products extraordinarily benefits **DEFENDANTS** financially.

///

---

[2] Addiction researchers agree that addiction involves six core components: (1) Salience—the activity dominates thinking and behavior; (2) Mood modification—the activity modifies/improves mood; (3) Tolerance—increasing amounts of the activity are required to achieve previous effects; (4) Withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) Conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) Relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

14. **DEFENDANTS'** actions arise from quintessential corporate greed, resulting from a conscious and deliberate decision borne from engaging in ruthless cost-benefit analysis.

15. Under the guise of providing harmless and safe digital interactive games and entertainment to the masses, **DEFENDANTS** placed profits over the health and well-being of consumers, including minors, to whom they aggressively market their defective Products.

16. **DEFENDANTS'** decision has resulted in a considerable and growing population of minors who have developed an addiction or disordered need to use **DEFENDANTS'** Products, to the extreme detriment of their still-developing brains.

17. As of 2022, "Gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and the International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[3]  "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, and context of gaming); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

18. Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[4] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include:  (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and

---

[3] Other disorders found in that subcategory include alcoholism and gambling addiction.

[4] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.[5]

19.    Nationally recognized institutions such as the Cleaveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as fulling under the general category of IGDs.[6]

20.    **DEFENDANTS** placed into the stream of commerce certain Products that were intentionally designed to be as addictive as possible to those who use them, particularly to minors . **DEFENDANTS** did so despite having actual and/or constructive knowledge of the risk of harm their Products posed to users and their families, because of the addictive design features.

21.    Plaintiff X.E., and minors similarly situated, did not start using **DEFENDANTS'** Products with any knowledge or reason to think they could ever develop an addiction or disordered compulsion to using them. Nor did Plaintiff X.E.'s parents, or other parents similarly situated, have any such knowledge or reason to think the same.

22.    **DEFENDANTS** acted with intent to cause minors, including Plaintiff X.E., who used their Products, to develop an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use could occur. **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence (AI), and operant conditioning systems to cause the user to develop an addiction or disordered compulsion to use them. **DEFENDANTS'** intent was realized: Plaintiff X.E. developed an addiction and/or disordered compulsion to using the

---

[5] Video game addiction or "internet gaming disorder" requires 5 of the 9 diagnostic symptoms.

[6] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).

1  Products and, as a result, the **DEFENDANTS** generated profits from their wrongful and tortious

2  actions.

3  <center>**NATURE OF THE ACTION**</center>

4      23.   Plaintiff realleges and incorporates by reference all of the foregoing allegations as if

5  repeated in full here.

6      24.   This action seeks to hold **DEFENDANTS** accountable for causing and contributing to a

7  global epidemic of minors suffering from an addiction or disordered compulsion to use the

8  **DEFENDANTS'** Products. The **DEFENDANTS** caused and contributed to creating such injuries and

9  damages by participating in placing into the stream of commerce Products which were defective and

10  unreasonably dangerous in that they were designed and intended to cause users, specifically minors, to

11  develop an addiction or disordered compulsion to using them.

12      25.   Plaintiff's injuries and damages, legally and proximately caused by the **DEFENDANTS'**

13  participation in placing their defective, unreasonably dangerous Products into the stream of

14  commerce, include but are not limited to: video game addiction, cognitive impairment, preoccupation

15  and/or compulsion with using the Products, extreme prioritization of the use of the Products to the

16  exclusion of all other activities, including required participation at school resulting in Plaintiff facing

17  significant academic (scholastic) and behavioral challenges that have resulted in an Individualized

18  Education Program, withdrawal symptoms when use of the Products is removed or limited, including

19  in the form of extreme expressions of aggression, sadness, and emotional dysregulation in general,

20  severely diminished willingness and inability to engage in social interactions with family members to

21  the point of suffering social isolation, engaging in deceptive tactics employed to hide from Plaintiff's

22  parents the Plaintiff's extreme use of the Products including hiding use in the very early morning for

23  several hours while Plaintiff's parents are asleep, a need to increase use of the Products to obtain the

24  same emotional (calming) response, and continued use of the Products despite negative consequences

25  to Plaintiff's social relationships and academic success.

26      26.   The **DEFENDANTS'** defective and unreasonably dangerous Products are used by

27  millions of minors many of whom, like Plaintiff X.E., began playing as young children and either

28  have developed an addiction or disordered desire to using the Products or are at severe risk of

<center>6</center>

developing that injury. Their addiction is like any other; it consumes the life of the addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the person will engage in self-harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

27. This action arises from the **DEFENDANTS'** brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to the user. The **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the Products to be designed with addictive qualities and features with the intention of causing users to want to use the Products more and more.

28. This action for personal injuries is rooted, in part, in strict product liability based upon defective design and failure to warn. The design defects of the Products were present in the Products when they left the hands of the **DEFENDANTS,** were not reasonably safe for ordinary consumers to use, and were particularly unsafe for minors, because they contained addictive features intended to cause the user to want and then need the Products more and more, until the user develops an addiction or disordered compulsion to use the Products. The warning defects of the Products are reflected in the complete absence of any warnings directed to minor users and/or their caregivers regarding the risk of severe harm from using the Products in a reasonably foreseeable manner, including severe physical, mental, social, educational, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the Products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiff herein. There is no warning about the risks described herein that are posed by **DEFENDANTS'** Products.

29. This action for personal injuries is also rooted, in part, in negligence arising from the **DEFENDANTS'** participation in placing their defective, unreasonably dangerous Products into the stream of commerce and into the hands of Plaintiff, Products that included no warning of the dangers associated with use for their intended purpose and as reasonably foreseeable, risks for which the **DEFENDANTS** had a duty to disclose to the consuming public but which they did not disclose, and

which resulted in causing serious injuries to Plaintiff. The **DEFENDANTS** knew, or in the exercise of ordinary care should have known, that their Products would be harmful to a significant percentage of minors who used them because those Products were intentionally designed to incorporate and employ addictive design features. The **DEFENDANTS**, despite that actual or constructive knowledge, failed to (by choosing to not) redesign their Products to ameliorate the potential harms posed by the Products, and failed to warn users and/or the caregivers of users of the risks posed by the Products.

30.    This action for personal injuries is rooted, in part, in common law negligence arising from the **DEFENDANTS'** breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minors. **DEFENDANTS** either knew or should have foreseen the likelihood of risk of harm posed by the dangers of using their Products and the breach of their duty to disclose or warn of those dangers which caused severe harm to the Plaintiff herein.

31.    This action for personal injuries is rooted, in part, in the torts of false representation and intentional tort, including fraudulent deceit, deceit, and concealment. The **DEFENDANTS** made material omissions of fact designed to lull potential users of their Products, and caregivers of minor users, to have no concern in using their Products and to trust that they were safe to use when done so in a reasonably foreseeable manner. The **DEFENDANTS** placed profits above users' safety. The **DEFENDANTS** made untrue expressions of fact or suggestion of fact which Plaintiff and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and had no reasonable ground for believing to be true. The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their Products, facts which they knew or should have known to be true and which they had a duty to disclose to Plaintiff, and those similarly situated to Plaintiff. The **DEFENDANTS** expressly and impliedly represented to members of the general public, including purchasers and users of the Products, including Plaintiff herein, that their Products were of merchantable quality and safe for foreseeable use. Plaintiff's parent relied upon those representations in purchasing the Products and allowing their minor child to use those Products, when **DEFENDANTS** knew that their representations and expressions of "product safety" were untrue.

///

32.    The **DEFENDANTS'** defective Products and tortious conduct, as herein alleged, were the actual and proximate cause of the injuries and damages Plaintiff sustained.

### *The Products*

33.    The purpose and intended function of the Products is to provide a tangible mechanism for digital, interactive play, skill building, and amusement, and thus consumption, just like any other toy, game, or gadget used or played by humans.

34.    The purpose and intended function of the patented technologies of addictive design features incorporated into the **DEFENDANTS'** Products—*i.e.*, an invention or idea of addictive design culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to develop and place into the stream of commerce Products that cause a user to develop an addiction to using and/or compulsive need to use the Products which, in turn, generates revenue for the **DEFENDANTS**.

35.    The **DEFENDANTS** participated in placing into the stream of commerce, the defective, unreasonably dangerous Products. The **DEFENDANTS** participated by designing, developing, marketing, manufacturing, selling, failing to warn about, failing to instruct about, distributing, testing, patenting, licensing, assembling, packaging, labeling, preparing, and supplying, and otherwise providing accessibility to consumers to use (hereinafter generally referred to as "placing into the stream of commerce") the Products.

36.    In this action, the defective, unreasonably dangerous Products include Roblox video gaming products used by X.E. including the patent-protected technologies of addictive designs features incorporated therein, via Roblox's online app downloaded on one or more phones or gaming systems.

37.    The Products include and incorporate mechanisms of operant conditioning, a form of behavioral manipulation that uses a system of rewards and punishments to influence behavior that targets the users' dopamine receptors and causes users to hyperfocus on using and overusing the Products.  The operant conditioning incorporated into the Products (along with illegally retained and/or obtained personal information of the users/players) work in conjunction with one another and with microtransactions to market Roblox, and specifically its virtual currency.

38.   The above-identified Products served as Plaintiff X.E.'s "gateway" Products that introduced X.E. into video game addiction: the first games and devices with addictive technology that Plaintiff experienced using and, as such, X.E.'s entry or "gateway" into using the Products.

39.   The **DEFENDANTS'** Products are mass-manufactured and marketed products that injure consumers in ways that are not capable of being anticipated by the consumer/user (or, in the case of minors who are users by their caregivers).

40.   The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine[7] release in the user that is similar in magnitude to that experienced by drug use or gambling.  The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors and particularly true in neurodivergent minors, whose brains are still developing.

41.   The repetitive release of dopamine that was designed to and does occur in users (especially minors) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the Products is addictive or disordered. Dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of gaming that cause life-altering impulse and inhibitory control behaviors. This results in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, significant weight changes, and other harmful effects; where, as here, the user is a minor, the user's caretakers/family suffer severe emotional detriment and pecuniary damage.

42.   Neurodivergent minors, including those with ADHD, are particularly susceptible to the addictive features of the Products and the resulting injuries.

///

---

[7] Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of one's body. Dopamine serves as the brain's all-important "reward center" and plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement.

### *Defective Design: Operant Conditioning and Microtransactions*

43.   Upon information and belief, the **DEFENDANTS** engaged, employed, partnered, collaborated, followed, obtained access to, and/or otherwise contracted with behavioral psychologists for the purpose of engaging in studies of what effect using video games that incorporated particular designs had on a user's brain, and particularly on users who are minors. Those studies revealed that the Products designed to use and incorporate operant conditioning—a methodology that uses rewards and punishments to influence behavior and through which certain behaviors that are reinforced are more likely to be repeated and which typically involve and are geared towards behaviors affecting one's environment—target the user's dopamine receptors that trigger the user's desire to hyperfocus on using and overusing the Products.

44.   Upon information and belief, the **DEFENDANTS**, relying upon those studies, created or caused to be created, and/or licensed or purchased, patented technologies and systems protecting inventions and ideas of addictive design features rooted and premised upon operant conditioning, and included, either negligently or intentionally, said addictive design features in the Products to cause users to develop a compulsion to use the Products.

45.   Upon information and belief, the **DEFENDANTS** entered into licensing agreements with patent-holding entities, and then incorporated into the Products the patented technologies of addictive design features that employ operant conditioning. As a result, the **DEFENDANTS'** Products create and reinforce in their users a compulsion to use the Products until that use develops into an addiction or disordered compulsion that causes negative consequences, injuries, harm, and damages to the user and where, as here, the user is a minor, damage and harm to the user's caretakers.

46.   The patent-protected operant conditioning methodology incorporated into the Products is presented in various forms (e.g., feedback loops and reward systems) and makes the Products progressively more stimulative, which results in significantly maximizing a minor's usage time and increases the user's desire to use the Products.

47.   The longer a user engages in playing **DEFENDANTS'** Products, the more money the **DEFENDANTS** continue to generate.

///

48.   Upon information and belief, the **DEFENDANTS** intentionally or negligently incorporated the addictive design features into the Products, despite knowing the risks and dangers they pose, with the intent of causing users to use the Products more and more, so that the **DEFENDANTS** would generate more money. The **DEFENDANTS** succeeded in doing both, all at the expense of the brains and bodies of the users, and at the expense of the mental and financial health of caretakers of minors, who wanted to use the Products they thought were safe, because they were reassured that they were safe, even though they were unreasonably dangerous.

49.   Microtransactions refer to the exchange of real money for in-game downloads, items or perks. Microtransactions are inextricably tethered to the operant conditioning methodology incorporated into the Products that are designed to addict users, minors in particular because the more one uses the Products, the more microtransactions in which the user will engage. All of this occurs by design, specifically intended by the **DEFENDANTS**: the **DEFENDANTS** engineered the Products to addict users so that users will use the Products more and, therefore, have to engage in microtransactions. This results in out-of-control spending because the user has developed an addiction or disordered compulsion to using the Products.

50.   Microtransactions were designed to, and do, exploit operant conditioning features to ensure and repetitively trigger the impulsive behavior within the gaming environment, one that brings its own peer pressure, to drive in-game purchases. Microtransactions are a wildly successful monetization scheme. The desire and need to engage in microtransactions in minors who have an addiction to, or disordered use of, the Products, triggered by operant conditioning features, is all but irresistible to users who have real money to spend.

51.   Upon information and belief, the **DEFENDANTS** relied upon the addictive design feature of operant conditioning incorporated into the Products to efficiently trigger corresponding microtransactions. Engagement with microtransactions is an important if not necessary aspect of using the Products and is critical to the **DEFENDANTS'** ability to generate money on an ongoing basis.

52.   Microtransactions are the culmination of the **DEFENDANTS'** extensive cost-benefit business decision whereby they chose to prioritize their already astronomical profits over the health and well-being of consumers, specifically minors whose brains are most easily affected by the

addictive qualities of their Products and who are similarly the most vulnerable to the risk of harm use of the Products pose.

53.   The more one uses the **DEFENDANTS'** Products, the more likely the user is to develop an addiction or disordered compulsion to using the Products. The more the user uses the Products, even in the face of experiencing severely negative consequences to their health or relationships, the more the user is motivated by the operant conditioning methodology with which the Products are designed that trigger their microtransaction engagement. The more microtransactions the user engages in, the more money the **DEFENDANTS** generate.

54.   Reasonable minors who use the **DEFENDANTS'** Products, and reasonable caregivers of such minors, do not and have no reason to expect that the Products are psychologically and neurologically addictive.

55.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to develop and place into the stream of commerce Products that are not designed to be addictive to their users by resolving to incorporate in those Products a patented technology that does not include addictive design features and is not intended to cause addictive or disordered use– after all, there are video gaming products on the market that do not include such addictive design features.

56.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to warn consumers of the addictive design features of their Products.

57.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to reduce the harmful consequences and risk of danger their unreasonably dangerous Products pose to users, especially to minors, by limiting the frequency and duration of access to the Products. By way of example, the **DEFENDANTS** could incorporate design features that suspend access to the Products during sleeping hours or design software that limits the frequency and duration of cross-play of the Products. Such features and others like them are feasible in that they could be accomplished at negligible cost, whereas the benefits that result to the consuming public and particularly minors, would be significant to their physical and mental health.

58.   The **DEFENDANTS**, upon information and belief, negligently, intentionally, and recklessly, incorporated microtransactions as a part of the design of the Products with the goal of

financially capitalizing upon the foreseeable consequences of employing operant conditioning methodologies on users, particularly the minors to whom the Products are directly marketed.

### *Defective Warning: No Warning of the Products' Known or Knowable Dangers*

59.   The catastrophic harm, injuries, and damages caused by the use of the **DEFENDANTS'** Products is extremely dangerous to the health and welfare of users and, when minors, their families.

60.   Upon information and belief, from the inception of when the **DEFENDANTS** conceptualized the idea of developing and designing their Products, at no time did the **DEFENDANTS** warn the general consuming public, inherently including Plaintiff herein, of the defects, dangers, and risks of using their Products, particularly those to minors; instead, and despite acknowledgment of a diagnosable gaming disorder by the World Health Organization and the American Psychiatric Association, the **DEFENDANTS** continue to insist that their Products are safe.

### *The Conduct: Negligent, Intentional, and Reckless*

61.   This action arises from each of the **DEFENDANTS'** negligent, intentional, and reckless conduct in their participation, in placing into the stream of commerce and marketing specifically toward minors, including Plaintiff X.E., their Products that are defective and unreasonably dangerous as herein alleged.

62.   The **DEFENDANTS** had actual and/or constructive knowledge or awareness of the defects, dangers, and risks that their Products posed to users, and specifically to minors, but nonetheless continued to put those Products into the stream of commerce without providing any warnings of the dangers they posed, including into the hands of Plaintiff herein, all the while knowing that the consuming public (including Plaintiff) did not know of and had no reason to suspect of the dangers the foreseeable use of the Products posed to users and particularly to minors.

### *Plaintiff's Injuries and Damages Caused by Plaintiff X.E.'s Use of the Products*

63.   The Products placed into the stream of commerce by the **DEFENDANTS** directly and proximately caused catastrophic personal injuries to Plaintiff X.E. as a result of their foreseeable use of the Products.

64.   Plaintiff X.E.'s use of the Products was done in a reasonably foreseeable manner and according to their intended purpose.

65.   Plaintiff X.E.'s use of the Products resulted in a disordered, compulsive, and addictive overuse, just as the Products were engineered and designed to cause, and without any warning of that design and risk.

66.   As a result of Plaintiff X.E.'s use of the Products, X.E. developed the following physical and mental injuries including: video game addiction, cognitive impairment, preoccupation or compulsion with using the Products, withdrawal symptoms when use of the Products is removed or limited that includes emotional tantrums with intense verbal aggression, including at school, prioritizing gaming over all other activities specifically including extracurricular activities such as sports, ongoing suffering school performance resulting in an Individualized Education Plan, disruption in sleep, i.e., not sleeping so that X.E. can continue to use the Products instead of sleeping, unsuccessful attempts to control participation in gaming, jeopardizing relationships and education opportunities because of participation in gaming, the need to spend increasing amounts of time engaged in gaming, loss of interest in other hobbies and entertainment, use of gaming to relieve or escape negative moods, depression, and continued use of games despite knowledge of psychosocial problems.

67.   The **DEFENDANTS'** participation in placing the defective Products into the stream of commerce, and specifically into the hands of Plaintiff herein, was negligent, intentional, deceptive, fraudulent, willful, and reckless. Because that participation was the legal and actual cause of Plaintiff's injuries, Plaintiff is entitled to recover compensatory damages in an amount according to proof and to punish the **DEFENDANTS** for their wrongful conduct in placing into the stream of commerce Products designed to be addictive to the user, to the extreme detriment to the user, including Plaintiff X.E., in a manner that was and is malicious, wanton, willful, oppressive, and done with reckless indifference to Plaintiff and the public's safety and welfare.

## **PARTIES**

68.   Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

///

///

***The DEFENDANTS***

69.   **DEFENDANTS** in this action are ROBLOX CORPORATION;  and the FIRST DOE through ONE-HUNDREDTH DOE, inclusive, *i.e.*, the **DEFENDANTS**, one or more of which are corporations and/or limited liability companies and/or legal partnerships and/or entities incorporated, organized, and existing under and by virtue of the laws of the State of California, or the laws of some other state and/or foreign jurisdiction and which have the authority to do business in this State, and/or are headquartered in this State, and/or have a principal place of business in this State, and/or are doing business in the State of California, and all of which regularly conduct business throughout the State of California, such that each of the **DEFENDANTS** has sufficient minimum contacts in California, and which also regularly do business in San Mateo County.

70.   At all times herein mentioned, the **DEFENDANTS**, and each of them, was the successor, successor in business, successor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in an entity that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Products, specifically including those used by Plaintiff X.E., and all of which the **DEFENDANTS** put into the stream commerce in a defective condition, whether in design or warning, whether negligently, intentionally, recklessly, or otherwise, that could, and did as to Plaintiff X.E., cause disordered or addicted use to their severe damage. Said entities shall hereinafter collectively be called "alternate entities."

71.   Each of the **DEFENDANTS** and their alternate entities are liable to Plaintiff for placing the Products into the stream of commerce and into Plaintiff X.E.'s hands to their detriment, and to their family's severe injury, detriment, and damage and also because the **DEFENDANTS** and their alternate entities either knew, or should have known, were aware or should have been aware, that the Products were defective and unreasonably dangerous in that they incorporated addictive design features that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users, particularly minors.

72.   Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign,

predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole or partial owner, or wholly or partially owned entity, or entity that it is a member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products that caused injuries as herein alleged to Plaintiff.

73.    The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of **DEFENDANTS'** FIRST DOE through ONE-HUNDREDTH DOE, inclusive, are unknown to Plaintiff at this time, and Plaintiff, therefore, sues said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiff will amend this Complaint accordingly. Plaintiff, upon information and belief, alleges that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the defective products and conduct herein alleged, for the injuries and damages proximately caused thereby to Plaintiff.

74.    Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee, and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting in the full course and scope of said agency, service, employment and/or joint venture.

### *Defendant Roblox Corporation*

75.    Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business in San Mateo, California. Roblox Corp. is authorized to do business in the State of California, does business in the State of California, and its registered agent for service of process is CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, California 95833. At all times material hereto, Roblox Corp. is a video game developer who designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Roblox either directly or indirectly to members of the general public within the State of California, including to Plaintiff.

///

///

*__The Plaintiff__*

76.   Plaintiff in this action is an individual, a minor child, who is and was at all relevant times, a resident of the United States, State of Florida, County of Orange.

77.   The minor child Plaintiff in this action is X.E.; X.E.'s interests in this action are represented by and through X.E.'s Guardian ad Litem RICKELL MATHEWS.

78.   Plaintiff in this matter has suffered personal injuries, and sequela thereto, as a result of X.E.'s use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

79.   Plaintiff X.E. is, at the time of filing this action, eleven (11) years old.

80.   Plaintiff X.E. began playing Roblox sometime in 2022, when he was eight (8) years old on an iPhone and several years later, began playing Roblox on PlayStation 5 when it became available on the platform in 2023. Since that time, X.E. has continued to use **DEFENDANTS'** Products without break, uncontrollably and compulsively.

81.   X.E. developed a disordered compulsion or addiction to using Roblox quickly, within several weeks, and began consistently playing several hours a day.

82.   X.E. currently uses **DEFENDANTS'** Products approximately 6-8 hours per day during the school week, and closer to 8-10 hours per day during weekends and during summer when school is not in session.  Using the **DEFENDANTS'** Products, to date, continues to be the only activity X.E. wants to do and, left to X.E.'s own caretaking, X.E. likely would not stop using the Products ever, if X.E. could prevent it.

83.   The defective Products here at issue, and the **DEFENDANTS'** participation and/or conduct in placing into the stream of commerce said Products, including into the Plaintiff's hands, was and is the actual and legal cause of the harm, injuries, and damages to X.E., as alleged herein. The **DEFENDANTS'** conduct as herein alleged likewise actually and proximately caused the injuries, harm, and damages suffered by Plaintiff, including addiction to video games and cognitive impairment.

84.   Plaintiff X.E.'s use of the defective Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

and addictive overuse in users, did so create in Plaintiff a disordered, compulsive, and addictive desire and need to play with and use **DEFENDANTS'** Products at an increasing rate, to Plaintiff X.E.'s extreme detriment and harm, including addiction and cognitive impairment, and to the exclusion of other activities, hobbies, and social interactions other than attending school that X.E. had previously engaged or engages in now.

85.   Plaintiff X.E. rapidly became addicted to using the **DEFENDANTS'** Products; X.E.'s use of the Products and particular the operant conditioning incorporated into the Products was a substantial factor in causing X.E.'s video game addiction and the sequela of injuries that has stemmed and resulted therefrom: video game addiction, cognitive impairment, preoccupation or compulsion with using the Products, withdrawal symptoms when use of the Products is removed or limited that includes emotional and volatile tantrums with intense verbal aggression, including at school, prioritizing gaming over all other activities specifically including extracurricular activities such as sports, ongoing suffering school performance resulting in an Individualized Education Plan, disruption in sleep, i.e., not sleeping so that X.E. can continue to use the Products instead of sleeping, unsuccessful attempts to control participation in gaming, jeopardizing relationships and education opportunities because of participation in gaming, the need to spend increasing amounts of time engaged in gaming, loss of interest in other hobbies and entertainment, use of gaming to relieve or escape negative moods, depression, and continued use of games despite knowledge of psychosocial problems.

86.   Despite the efforts of Plaintiff's parents to limit the time X.E. was and is using the Products, those efforts have been chronically challenged by the severe withdrawal symptoms X.E. suffers when use of the Products is reduced, consisting of severe and volatile emotional outbursts, and have ultimately been unsuccessful in achieving a lifestyle where X.E. does not chronically use the Products or otherwise function like a typical child of their age should and did prior to when X.E. began using the gateway Products that introduced X.E. to video game addiction, as identified herein.

87.   On several occasions, X.E.'s mother has deleted the Roblox application from X.E.'s phone and denied Plaintiff access to the Products, but due to Plaintiff's compulsion and addiction, Plaintiff continues to go behind her back and reinstall the application to continue using the Products.

88.    In November of 2024, X.E.'s mother attempted to limit X.E.'s use of the Products, and X.E.'s mood, behavior, and school performance suffered so severely that he was referred to a mental health counselor who diagnosed him with depression. X.E. has been meeting with the mental health counselor weekly since that time.

89.    In early 2025, X.E.'s mother again attempted to limit X.E.'s use of the Products, and in response, X.E. attempted to run away from home.

90.    Principle among the reasons and factors why Plaintiff X.E.'s ability to stop using the Products remains chronically challenged is the fact that X.E. is and was a "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the Products, an addiction proximately caused by **DEFENDANTS'** deceptive tactics and fueled by the absence of parental controls and time-limit restrictions within the Products, design features that gave the false appearance to Plaintiff X.E.'s parents that X.E. was playing far less than X.E. actually was, and, finally, the **DEFENDANTS'** resolve to not provide a warning to X.E.'s parents so as to disclose the addictive operant conditioning design incorporated into the Products and as a result stripped X.E.'s parents from a meaningful opportunity to make an informed decision regarding the risks of using the Products.

91.    Plaintiff X.E.'s addiction to the Products occurred rapidly: within a few weeks at most, of when X.E. began using them. Plaintiff spends an equal if not more time using the **DEFENDANTS'** Products than X.E. engages in most all other activities, including sleeping, socializing, spending time with their family, receiving educational instruction, playing sports, or engaging in any other activity because X.E. engages in no other activities, all to the severe and long-lasting detriment to X.E.'s cognitive development, social development, and ability or desire to maintain good grades and maintain appropriate social and emotional development milestones. Plaintiff X.E. continues to chronically struggle with a disordered compulsion and addiction to using the Products and continues to structure and manipulate their behaviors and activities around maintaining access to using the Products.

92.    Plaintiff X.E.'s addiction to using the **DEFENDANTS'** Products is compulsive and disordered; X.E. was and is incapable of restraining themselves from using the Products without experiencing severe withdrawal symptoms that involve volatile emotional outbursts. Plaintiff's

1    parents have been unsuccessful in attempting to reduce X.E.'s usage time due to the severe and

2    volatile emotional outbursts when the X.E.'s access to the Products is reduced or limited and due to

3    the extremely deceptive tactics X.E. engages in to gain access to use, including re-downloading the

4    Roblox application on X.E.'s phone and playing in the middle of night when X.E.'s mother is asleep.

5        93.    Plaintiff X.E. did and does suffer and continues to suffer physically, mentally, and

6    emotionally from the injuries and harm caused by their use of the **DEFENDANTS'** addictive

7    Products.

8    ***Plaintiff and the DEFENDANTS: No Contract***

9        94.    Neither the Plaintiff nor any of their caretakers knew that **DEFENDANTS'** Products

10   were and are designed to be addictive and would likely harm a child if used as intended by

11   **DEFENDANTS**; Plaintiff nor anyone else agreed for Plaintiff to be harmed or exposed to addictive

12   products. Plaintiff was incapable of entering into a contract with any of the **DEFENDANTS** and/or to

13   the extent any of the **DEFENDANTS'** claim Plaintiff X.E. or anyone else attempted to accept an

14   electronic term and condition clause on X.E.'s behalf by clicking buttons on a screen that reflected

15   language X.E. nor any anyone else understood, read, or which were unconscionable, it has since been

16   voided by virtue of its unconscionability and the power of disaffirmance which is demonstrated and

17   secured by the filing of the instant Complaint and, in addition the following statement: Plaintiff X.E.,

18   a minor child, lacks capacity to contract and expressly disaffirms any agreement X.E. may have

19   accepted through X.E.'s Roblox or other Defendants' account(s) and does not and did not consent to

20   arbitrate any of the claims in this action and disaffirms the entirety of any user agreement, contract, or

21   other agreement that was accepted through said Roblox or other Defendants account(s) relevant to this

22   action.

23       95.    Plaintiff X.E.'s continued use of the **DEFENDANTS'** Products, even after the filing of

24   the instant Complaint, to the extent there is such use, is compulsive and due to X.E.'s disordered

25   compulsion and addiction to using the Products and cannot and does not serve as an affirmation of

26   any contract, however hypothetical, between the Parties, nor does it serge as ratification of any

27   agreement or contract given that X.E. is still of minor age.

28   ///

96.    Moreover, each of the **DEFENDANTS'** terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by users to accept and to continue to accept any new terms and conditions during the course of using the Products results in a loss of access to the purchased products. Accordingly, any terms to which Plaintiff may have agreed prior to using any of the **DEFENDANTS'** Products are void and unenforceable. Moreover, because the **DEFENDANTS'** Products were designed to and did cause Plaintiff X.E. to develop an addiction or disordered compulsion to using the Products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the Parties to this Complaint are void as against public policy as an individual cannot consent to harming a minor.

## JURISDICTION AND VENUE

97.    Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

98.    This action alleges causes of action seeking relief arising under and pursuant to the laws of the State of California, including but not limited to the allegation that as a direct and proximate result of the **DEFENDANTS'** Products and their negligent, deceptive, fraudulent, willful, immoral, reckless and unlawful actions and inactions, representations and misrepresentations, including by omission, Plaintiff suffered and continues to suffer injuries and damages within the State of California in an amount within the jurisdictional limits of this court.

99.    The California Superior Court has personal jurisdiction over the **DEFENDANTS**.

100.  The **DEFENDANTS** are corporations and/or entities that are citizens of the State of California. They are organized under the laws of the State of California or have a headquarters or principal place of business within the State of California and are thus "at home" in California; are foreign corporations and/or entities authorized to do business in California and are registered as such with the California Secretary of State; and are corporations and/or entities that are foreign, nonresidents of the State of California that have sufficient minimum contacts in, to, and with

California arising from activities whereby they have purposefully and intentionally availed themselves to the benefits and protections of the laws of the State of California, and the market of the State of California, and continue to date to avail themselves in that manner, and with respect thereto, the controversy reflected in this action is directly affiliated with, related to, and arises from said **DEFENDANTS'** contacts with the State of California, such that the exercise of jurisdiction over each of the **DEFENDANTS** by the California State courts is consistent with traditional notions of fair play and substantial justice and would be and is both reasonable and proper.

101. Venue is proper in the above-captioned Court: Because one or more of the **DEFENDANTS**  regularly conduct business in San Mateo County.

## **GENERAL ALLEGATIONS**

102. Plaintiff realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

### *The Video Gaming Industry*

103. A "video game" is a device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device, and which stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** Products.

104. The video gaming industry began slowly, taking more than 35 years to reach $35 billion; between 2007 and 2018, the industry grew significantly to $137.9 billion, and by 2023, the industry's revenue was $365.6 billion globally.

105. Early video game companies created games and sold them mostly through cartridges, discs, or other "physical" or "hard copy" formats to be played on devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

106. Today, video games, like Roblox are available for purchase and are also accessible via digital download through "app stores" (as well as online gaming networks and cloud gaming servers)

for use on and with gaming consoles, computers, mobile phones, and tablets.[8] A video game utilizes the same gameplay mechanisms, designs, and technologies in its development and design regardless of whether the product is used via digital download, online gaming network, and/or through a cloud gaming service (or physical disc).

107. Unlike early video games that were used and accessed (like traditional arcade video games) via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today —games that are designed to be used in conjunction with gaming consoles, mobile devices, computers, and tablets, —necessitate, if not require, a lengthy and ongoing if not continuous active participation during which time users are exposed to psychological techniques intentionally designed to control, manipulate and exploit the user's brain, and a minor's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

108. Gaming consoles (e.g., PlayStation), personal computers (e.g. Mac desktop, iMac, Chromebook), mobile phones (e.g., iPhone, Google Pixel, Android-based phone), and tablets (e.g. iPad)—and each device's associated Products as described herein—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

### *Monetization Schemes: Operant Conditioning and Microtransactions*

109. Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended to generate profit at the expense of the health of the users.

110. Microtransactions are intentionally, inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger and reinforce a disordered, addictive, and compulsive use of the Products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS'** Products, and is exposed to the addictive design

---

[8] For example: PlayStation, iPhone, Chromebook, Google Pixel, Android-based phone, Amazon Fire Stick, PC running Windows Operating System or MacOS system.

features borne from the operant conditioning systems, the more that user engages in microtransactions which generates real revenue for the **DEFENDANTS.**

111. The tremendous growth of the video gaming industry is in large part due to the advent of microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the Products to generate money for the **DEFENDANTS**.

112. The **DEFENDANTS** placed into the stream of commerce their Products designed to allow, encourage, and target people to use the Products with psychologically addictive features, properties, and technologies, including but not limited to operant conditioning, ever-changing gameplay, microtransactions, social aspects, patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

113. There is no meaningful disclosure of the addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the time they are purchased so as to allow prospective users or caregivers to make informed decisions as to whether using the Products is desirable, appropriate, safe, or worth the potential risk.

114. Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

115. Microtransactions may be presented to users during gameplay through a custom store interface placed inside the game for which the items are being sold, in a device's "app store", or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

116. Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are a non-essential component of the Products. The **DEFENDANTS** plan microtransactions with great intention.

///

117. The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from the ongoing microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in, if not dependent upon, the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue remains recurring for as long as the Product is available for use. When the user has an addiction or disordered compulsion to using the Products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

118. Microtransactions were intentionally and specifically designed to work in tandem with operant conditioning methodology, technique, and strategy, and to ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time limitation on a microtransaction offer may push a user to impulsively buy an item. Similarly, a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

119. Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of the Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially minors who are vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the Products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

120. The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b)

"Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

121. An additional aspect of the predatory monetization of the **DEFENDANTS'** Products is the collection and use of individual user data to manipulate the nature and presentation of in-game purchasing offers to maximize the likelihood of the user spending money. The Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor's illegally obtained and improperly retained personal information and biometric data to target the user and exploit their personal data.

122. Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more about the user than the user can know about the Products. This allows the gaming industry, including the **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize a user's expenditure of real money.

123. When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user to target products and microtransactions based upon their interests and preferences. The prices of in-game items may be determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity as to certain items. In this way, the Products incentivize continuous spending by the user.

124. Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers to, primarily, serve monetary goals and which lack basic transparency to the user, may also have the potential to exploit certain

vulnerable players under certain conditions. Critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for users who are minors to fail to understand the value of the actual money being spent which allows for more easeful and further if not continuous and chronic spending of real money.

125. A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include loot boxes, rubber-banding, and pay-to-win models.

126. A "loot box" is an in-game reward system that can be purchased repeatedly—with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that can be used to customize characters or weapons. Loot boxes are essentially a lottery used to increase revenue through underage gambling. It is common knowledge that gambling addiction is a severe issue that carries big risk in playing lottery-style games, so combining such gambling aspects with the psychologically addictive traits of video games makes for a highly dangerous scheme to which users are highly susceptible and will easily succumb. Loot boxes are ultimately controlled by the gaming developers as well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the design of the video games. Loot boxes result in high revenues for the **DEFENDANTS** because instead of a one-time purchase for the desired item, users may and typically do buy multiple boxes.

127. Rubber-banding is a monetization scheme used to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the user's skill level by, for example, matching computer opponents to a given user's skill level. The **DEFENDANTS** rely upon rubber-banding with microtransactions to ensure that the Products' financial requirements are adjusted to match the user's desire and capacity to use. If an item costs too much, the users of monetized games cannot strategize to win and instead must decide between making in-game purchases or not using the Products at all. Alternatively, the user potentially plays without paying but doing so with significantly diminished in-game capability, all of which generates feelings of frustration in the user, particularly a person with disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce the user's uncertainty or reluctance when faced with purchasing decisions.

128. Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use the Products more. Users who are willing to pay more money get a disproportionate advantage over other users, particularly if the items cannot be obtained for free. For example, users who pay money in microtransactions may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying users from progressing or remaining competitive.

129. The **DEFENDANTS'** use of microtransactions is carried out with such efficiency that it resembles a choreographed collaboration. The **DEFENDANTS'** target users with in-game downloadable content to purchase by using algorithms and design features incorporated into the Products which, in turn, results in profit to the system entities, likewise **DEFENDANTS** herein. In addition, and simultaneously, said system entities, including **DEFENDANTS** herein, collect data from users to target the additional Products based on the user's gameplay and personal preferences outside the game, to wit the user's other game play, social interactions, age, and the like, are relied upon.

130. The human population most vulnerable to the combination of **DEFENDANTS'** microtransaction methodology and addictive operant conditioning design features are users who are minors and/or neurodivergent. The **DEFENDANTS** know this, purposefully designed the Products to exploit that vulnerable population, to their extreme injury and detriment, including Plaintiff X.E. Doing so has yielded the intended results: the **DEFENDANTS** have garnered extraordinary financial revenue from this group of users as a result of placing their addictive Products targeted to minors into the stream of commerce.

131. The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, the **DEFENDANTS** intentionally caused and designed the Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that avail, upon information and belief, the **DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that

1  incorporated design features premised upon psychological tactics engineered to keep users engaged in

2  using the products for longer and longer periods of time.

3       132. The microtransactions and other technologies, designs, features, mechanisms, algorithms,

4  and artificial systems and other systems the **DEFENDANTS** incorporated into the Products was done

5  so in a manner such that users (and, when users are minors, their caretakers) do not understand and

6  have no way of understanding that their use of the Products involves engagement with intentionally

7  addictive design features that are physically damaging to their brains and bodies, and financially

8  rewarding to the **DEFENDANTS**.

9  ***Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products***

10      133. In previous years, lopsided consumer video game monetization-related inventions, such

11  as those identified herein, were patent-ineligible. There are now patents that protect ideas and

12  inventions of design features that are incorporated into video games that are intentionally designed to

13  cause addictive and disordered use of the Products that specifically target one's brains, and

14  particularly minors' brains. The **DEFENDANTS** agreed to and did develop, and/or made available

15  for or did purchase or license, or otherwise caused to be incorporated into their Products one or more

16  of this type of patented addictive design feature. The addictive design features incorporated into

17  **DEFENDANTS'** Products cause severe and irreversible injuries, harm, and damages to our society's

18  most vulnerable members, *i.e.*, minors, all the while lining the **DEFENDANTS'** pockets with

19  outrageous financial profit.

20      134. Several video gaming product developers have been granted patents of inventions and

21  ideas that are designs that include intentionally incorporated addictive features and qualities which

22  contribute to high-risk consumer behavior as alleged herein.

23      135. The **DEFENDANTS'** placement into the stream of commerce Products that are mass-

24  marketed to consumers, and particularly to minors, that incorporate patented technologies of addictive

25  design features engineered to specifically target the brains of users, serves as the ground zero through

26  which the **DEFENDANTS'** participation in placing the Products into the stream of commerce causes

27  users to develop an addiction or disordered use of their Products, a use which generates more revenue

28  for the **DEFENDANTS**. In so doing, the **DEFENDANTS** have masterfully engineered a process that

allows them to generate gross amounts of money from users, specifically including minors, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause.

136. The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the Products of another entity, including the **DEFENDANTS'** Products. It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

137. The patented addictive design features incorporated into the **DEFENDANTS'** Products make them progressively more stimulating which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the Products. For instance, feedback loops continuously add new in-game downloadable products and upgrades and use tactics to ensure users are creating habits in their gameplay, such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the Products is curtailed by negative feedback loops. Feedback loops enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the Products while still rewarding the user for their achievements and makes the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

138. The feedback loops, in addition to other the psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms and other systems that are used by the **DEFENDANTS** and/or at play when the user uses the Products are designed to keep users continuously engaged. Those patented addicted invention and ideas of addictive design features and other systems that are incorporated into or otherwise working in conjunction with the Products are able to study the skill level and behavior of the user, including and even across social media platforms

and website use outside of the Products. This results in the user being bombarded with solicitations to purchase additional in-game downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the Products and other online video gaming services to cause more and more use by users, all to the user's own detriment, and to the financial benefit to the **DEFENDANTS**.

139.  The **DEFENDANTS'** decision to place into the stream of commerce their intentionally addictive Products has resulted in an extreme uptick of video gaming addicts and extreme gamers.

140. The **DEFENDANTS'** participation in placing into the stream of commerce the Products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the Products, including **DEFENDANTS** herein, often seek to keep their intellectual property and/or the use of such intellectual property confidential. There are thus very few objective, transparent, or complete accounts of the precise nature of the monetization schemes employed in their Products. Nevertheless, several patents shed light on the innovative video game monetization inventions and ideas intended to lure and addict users of Products, and which are upon information and belief incorporated into the design and development of **DEFENDANTS'** Products. By way of example:

a.    U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that targets users unable to complete a game scenario and encourages the user to make in-game purchases when they face such a difficult scenario. This patented design mechanism is an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster … or player character."

b.    U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, Inc., is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is

used in Products, like **DEFENDANTS** at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions  comprises of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc.,  describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases.

Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

e.    U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f.    U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

g.    U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with Microsoft's patent:

i.    Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

///

ii.  The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

h.  U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning points by scanning codes on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

m.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

n.   U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

o.   U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This

allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

p.   U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

q.   International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

141. In addition to the above, the Products function, in part, through algorithms intended to and which do manipulate the type of use. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, that provide a framework of artificial intelligence to monitor, analyze, and control the usage and to increase usage time and to fuel microtransactions.[9]

142. Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated

---

[9] By way of example, see Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

said technology into the video game products, including Roblox, with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the Products to cause the user to want to use more and more in a disordered, compulsive, and unhealthful manner and to drive microtransaction engagement.

143. At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minors and specifically including Plaintiff herein, to use the Products and engage via microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

144. Each of the **DEFENDANTS**, with knowledge of X.E.'s age , targeted X.E. and induced them into microtransactions during their use of the Products via and as a result of the addicted design features incorporated into the Products. As a result of X.E.'s use of the **DEFENDANTS'** video game Products, Plaintiff X.E. was injured and damaged as herein alleged.

145. Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** video gaming products, make up 30% of the total revenue earned across the video gaming industry. The revenue is split between the developer of the game itself (e.g., Roblox Corp.,) and the developer of the systems, devices, and mechanisms which allow users to access and play the Products pursuant to licensing or other contractual agreements.

### *The Products at Issue: Roblox*

146. Roblox is an online video game, designed, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

147. Roblox Corp.'s "mission" for Roblox is to have a billion people actively using its Products each day.

148. Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; with the release of Roblox for use on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of Roblox users (particularly minors) grew exponentially.

///

149. Roblox Corp. saw an accelerated increase in the numbers of consumers who downloaded and used Roblox during the onset of the Covid-19 pandemic.

150. As of August of 2020, Roblox Corp. had over 164 million monthly active users. More than half of those users were American children under age 16.

151. The numbers of consumers, particularly minors, using Roblox continues to grow as Roblox Corp. makes its products available for use on more devices. For example, in 2023, when Roblox Corp. released versions of its Roblox product for use on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro.

152. Currently, Roblox Corp. has over 66 million daily active users and over 217 million monthly active users; more than 50% of consumers playing Roblox are under age 13.

153. Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



154. While Roblox Corp. has not released a version of Roblox for download and play on Nintendo Switch, Nintendo Switch users can access and play Roblox using the gaming console's built-in web browser.

---

[10] https://corp.roblox.com/

155. Roblox Corp. describes Roblox as an online social gaming platform and game creation system that allows users to use games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio, such that Roblox Corp. provides users all tools necessary to "experience" and "build" their gameplay.

156. Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games, as well as to allow users to engage in purchasable, one-time "game passes" and "developer products" microtransactions, for use and purchase by other Roblox users, including, of course, minors.

157. Roblox Corp. designed the social-gaming aspect of its product to allow users to use Roblox games (or "experiences") created by other users, which includes allowing users to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

158. Roblox Corp. is free to use, but by design encourages in-game purchases and product upgrade microtransactions which are purchased using "Robux", the product's virtual currency. Robux can be obtained in several ways: (a) purchased with real currency; (b) received as part of a recurring stipend that users with a Roblox Premium membership receive; and (c) earned from selling "game passes" or developer products" to other Roblox users.[11] Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increase.  For instance, corresponding with the Covid-19 pandemic triggered increase of Roblox users, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had already increased by 107% from 2020, and which had been an 111% increase over 2019.

159. Roblox Corp. markets the sale of Robux directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

160. Roblox Corp. designed Roblox to include addictive features rooted in operant conditioning and microtransactions —at the risk of minors' mental and physical health—to profit from the user's extended, long-term gameplay and corresponding in-game spending.

///

---

[11] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

161. Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their products included the best psychological traits and technologies for user retention and addiction.

162. Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, users can create games and maps for other users to try and use, a challenge in and of its own. Through research and product development, Roblox Corp. learned that when using games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the user's brain to seek dopamine hits on a more regular and then compulsive basis that leads directly into abuse, addictive behavior, and addicted and/or disordered use of Products.

163. The variety within Roblox ensures that users are never bored, nor grow tired of the product because that might cause users to want to stop using the product; there are always new challenges, maps, and characters to try out, which makes using the product feel like an ever-evolving entity that never stops providing entertainment.

164. The ability for users to create their own games and challenges, combined with users' ability to spend real-world money to change their avatar's image and abilities, ensures that using the product / playing the game feels different for users each time. Such constant variety in the experience felt by the user keeps users "hooked," returning daily to use the product for extended periods of time.

165. Roblox Corp.'s "social gaming" design allows users to interact with friends or other users within the game and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and are pressured to spend money to keep up with Roblox friends and competitors.

166. Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted users quickly spending large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

///

///

167. Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the product was designed to make users play more and more to their potential harm.

168. Roblox Corp. knew its product incorporated addictive designs that posed risks of causing users to develop dangerous and disordered use and overuse of the product, to the detriment and harm to the user, and chose to not inform the consuming public at large, users, or parents of minors who are users, of such risks.

169. Roblox Corp. describes and markets its product as an educational tool for minors: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[12] Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning enviro environments:



A New Era of Teaching and Learning

Our team is dedicated to helping educators harness the power of Roblox to create immersive learning experiences that inspire creativity, collaboration, and critical thinking.

[13]

170. While marketing its product as an educational tool beneficial to minors and neurodivergent individuals, Roblox Corp. at no point discloses the harms posed by its product or the addictive design features of Roblox's design or that Roblox contains numerous addictive principles that can negatively impact minors' livelihoods, including their ability to learn and engage in critical thinking.

///

---

[12] https://corporate.roblox.com/faq/
[13] https://education.roblox.com/

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

171. Roblox Corp., in connection with its Roblox video gaming system, engaged and/or engages in the following conduct:

    a.    Uses a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

    b.    Allows first-party and third-party advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of minors are exposed to that advertising daily;

    c.    Fails to adequately disclose to minors when advertising is present within experiences and videos on Roblox; and

    d.    Fails to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to minors.

172. Roblox Corp., independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

173. Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

174. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

///

175. Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury.

176. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injuries but concealed that information from the public and product users, including Plaintiff and their caretakers and parents.

177. Roblox Corp. misrepresented Roblox as safe for use by minors and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that Roblox poses significant risk of harm to users.

178. Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by minors and the harm that arises therefrom, and that have been experienced by minors, including Plaintiff X.E.

### *Products that Incorporate Addictive Design Features Affect the User's Brain*

179. Research has shown that prolonged use of Products damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has concluded that such use of Products may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

180. Empirical studies indicate that gaming disorder is associated with detrimental health-related outcomes.

181. Brain imaging studies have shown that use of Products negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

182. Other studies have shown that disordered and/or excessive use of Products leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

183. The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

184. Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants, as depicted here[14]:



[14] Weinstein, Livny, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

185. Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in similar way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

186. Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged of Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are d ted in the following image[15]:



187. Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

188. Research has shown that a neurodivergent minor with a diagnosis of ADHD or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction which can worsen one's ability to control impulsivity and result in brain damage.[16] Research has shown that

---

[15] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

[16] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).

while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when the Products incorporate microtransactions and other manipulative tactics.

189. The **DEFENDANTS'** Products were designed to and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing.  The increased dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

190. The repetitive release of dopamine that was designed to and does occur in minors who are users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products more and more, first at an increasing rate and then with compulsive desire until the impulse to use the products develops into a disordered use or addiction. Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the minor, specifically including the Plaintiff herein.

///

///

## **PLAINTIFF'S CLAIMS**

191. Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

192. The **DEFENDANTS** are estopped from relying on any statute of limitations as a defense in this action. The filing of this Complaint falls within the statute of limitations pursuant to applicable statutory law and via operation and application of the discovery rule and the tolling of the minor Plaintiff's right to causes of action. Moreover, the filing of this Complaint falls within the statute of limitations in light of the continuing nature of the alleged tortious conduct and the alleged participation by the **DEFENDANTS** in placing their defective video gaming product into the stream of commerce, an activity and course of conduct which is ongoing and, in addition, in light of the fraud-based claims embraced and adopted by the Restatement of Torts.

193. Plaintiff brings this personal injury action pursuant to and within the statute of limitations set forth in California Code of Civil Procedure § 335.1 in light of the application of California's "discovery rule" permitting the postponement of the accrual date of these causes of action until the Plaintiff discovers or has reason to discover the causes of action and, further, in light of the tolling of the applicable statute of limitations due to the minor Plaintiff's age pursuant to California Code of Civil Procedure § 352 and California Family Code § 6500.

194. Through the exercise of reasonable diligence, Plaintiff could not have discovered, nor did they have any reason to be suspicious, that the **DEFENDANTS'** Products and conduct as alleged herein, caused or could cause the injuries and damages Plaintiff sustained, because at the time those injuries revealed themselves, their cause was unknown to Plaintiff and Plaintiff did not suspect and had no reason to suspect that the **DEFENDANTS'** Products and/or conduct caused their injuries until within the last year.

195. Plaintiff's lack of suspicion was compounded, and their failure to discover the cause of the injuries earlier was furthered, by the fact that the **DEFENDANTS** had exclusive knowledge of the defects of the Products and resolved to not disclose those defects and dangers thereof to consumers and/or users of the Products, including to minors or their caretakers.

///

196. Plaintiff's lack of suspicion was further compounded by the **DEFENDANTS'** deceitful conduct and their resolve to make false and reckless misrepresentations to the public whereby the **DEFENDANTS** not only failed to disclose the risks posed by the Products for which they had a duty to disclose, but, and in addition, falsely conveyed to the public that the Products posed no risks of danger to users and were safe to use for their intended purpose and as reasonably foreseeable.

197. The **DEFENDANTS'** negligent, deceitful, and otherwise wrongful tortious conduct as herein alleged, along with their participation in placing into the stream of commerce defective and unreasonably dangerous Products, is continuous in nature such that, to date, that wrongful participation is continuing which means that so is Plaintiff's right of action against the **DEFENDANTS**. Accordingly, the statute of limitations to bring the causes of action alleged herein, for this additional reason, has not yet accrued and will not begin to accrue until the **DEFENDANTS'** tortious conduct and wrongful participation in placing their defective and unreasonable dangerous Products into the stream of commerce ceases.

## First Cause of Action: Strict Product Liability

### (Defective Design and Defective Failure to Warn)

198. Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

199. The **DEFENDANTS**, at all relevant times, have marketed and advertised the Products at issue herein throughout the United States, including in California, for personal use by end-users/consumers of all ages, including minors, and specifically Plaintiff herein.

200. The **DEFENDANTS** are designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective Products, whether in design or in failing to warn about, and each is strictly liable to Plaintiff herein for the harm and injuries and damages said Products caused.

201. The Products the **DEFENDANTS** placed into the stream of commerce were defectively designed; to wit, designed to cause addictive and compulsive use of the Products, including by minors, and without any warning of that danger, and which did in fact and proximately cause addictive, disordered use by Plaintiff X.E. and injuries and damages thereto as a result. Both defects,

in design and in warning, were present in the Products when they left the hands of the

**DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the

general consuming public to be used in their intended and foreseeable manner. The **DEFENDANTS'**

Products did cause users to develop a disordered, compulsive, and addictive use of those Products,

including Plaintiff X.E., to their detriment and harm.

202.  The **DEFENDANTS'** Products did not perform as safely as an ordinary consumer would

have expected, are more dangerous than other Products because they were intentionally designed to be

addictive to those using them, and specifically to minors, which causes a myriad of potential injuries

and harm and damages, and which here did result from Plaintiff X.E.'s use of their Products.

203.  The **DEFENDANTS'** Products were unreasonably dangerous and defective because they

incorporated addictive design features intended to cause addictive, compulsive, disordered use of the

Products that are not necessary to the intended utility of the Products and instead pose a risk of

dangers to users, risks that are and were known to the **DEFENDANTS** but not known or reasonably

anticipated by the users, including Plaintiff herein.

204.  Said defective design of the Products was and continues to date to be suppressed and

concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical

reward system of the user's brain (especially a minor's brain) to create addictive engagement and

compulsive use of the Products, without regard for consequential mental and physical harm. Said

series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiff

as alleged herein.

205.  The **DEFENDANTS'** defective and unreasonably dangerous Products posed risks to

users of the Products, particularly to minors, when used in their intended and foreseeable manner, and

despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care, should have

known, that said Products were defective and unreasonably dangerous to the minors who used them

who were at risk of suffering severe injuries as a result of their use.  The defects of the Products were

incorporated in said Products at the time they left the **DEFENDANTS'** possession.

206.  The **DEFENDANTS'** Products are defective and unreasonably dangerous because they

included no warning, an inadequate warning, no instruction, or an inadequate instruction, of the herein

identified risks and dangers the Products pose to users, and specifically to minors, as a result of foreseeable and intended use of the Products, despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care, should have known, that said Products were defective and that users, including minors, were likely to suffer severe injuries as a result. The Products here at issue contained no warning when the Products left the **DEFENDANTS'** possession.

207.   The defects in the design and warning of each of the **DEFENDANTS'** Products, as herein alleged, all existed prior to their release to the public, and there was no substantial change to any of the Products between the time of their distribution into the stream of commerce, including the absence of an adequate warning, and when they reached the hands of the consumer public, specifically including Plaintiff herein.

208.   Plaintiff X.E. used the **DEFENDANTS'** Products as intended and as reasonably foreseeable, and each **DEFENDANT** knew or, by the exercise of reasonable care, should have known that minors, inherently including Plaintiff X.E., would use the Products without anyone inspecting the Products for addictive or other dangerous features.

209.   Reasonable users of **DEFENDANTS'** Products would not expect, and Plaintiff herein did not expect, that said Products would pose risks of severe physical and mental harm much less that the **DEFENDANTS** knew of those risks and nevertheless chose to place the Products into the stream of commerce and in doing so placed financial profit over the health and safety of the consumers, including minors.

210.   The **DEFENDANTS'** participation in placing the defective Products into the stream of commerce, and into the hands of Plaintiff specifically, was a substantial factor in causing Plaintiff's injuries and harms, both the actual and proximate cause of those injuries, and Plaintiff is entitled to recover compensatory damages in an amount according to proof, standing, and applicable statute(s).

211.   In addition to failing to perform as safely as an ordinary consumer would expect, the **DEFENDANTS'** Products pose risks to users, specifically minor users, when the Products are used as reasonably foreseeable and as intended. The benefits of the defective design of the **DEFENDANTS'** Products, as financially profitable as they may be, are outweighed by the horrific physical and mental injuries and harm the development of addicted or disordered use causes, particularly in minors.

212. The gravity of the potential harm arising from the defective Products, as herein identified and alleged, is severe. The likelihood that said harm, as alleged, will occur is high.

213. An alternative safer design of the **DEFENDANTS**' Products, at the time of their design, development, and distribution, was and is entirely feasible. Each of the **DEFENDANTS** could have utilized cost-effective, reasonably feasible alternative designs including those that omit or minimize addictive features incorporated into the Products to minimize the harms and risk of dangers addictive features pose to users, including but not limited to: choosing to not use and incorporate into the Products the patented technologies containing "addictive" design features as herein described and alleged; redesigning gaming software to limit rather than promote addictive engagement; implementing robust age verification, effective parental controls and notifications; warning of health effects of use and extended use upon sign-up or log-in; implementing default protective limits to the length and frequency of gaming sessions, opt-in restrictions to the length and frequency of gaming sessions, self-limiting tools, including but not limited to gameplay time notifications, warnings, or reports; implementing blocks to use during certain times of day (such as during school hours or late at night), limits on number of usable games per day; limits on the strategic timing and clustering of offers and/or assignments and challenges to keep users engaged and using longer; implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day; and by designing products that did not include other defective features listed in this Complaint while allowing users to engage with products in a manner that is addictive free.

214. The cost of an alternative design is de minimis at best (being hypothetically costly only to the **DEFENDANTS'** financial bottom line that the **DEFENDANTS** have always placed above the health and safety of users, including minors). There are no meaningful disadvantages to said alternative design. The safety and well-being of users of the Products, especially those who are minors, who risk brain damage and life-long addictive and disordered behaviors and a myriad of other potential life-altering physical, mental, and emotional disorders as previously identified herein that are caused by using the Products, render the application of the risk-benefit test here articulated forever in the favor of the consumer public, and Plaintiff's, specifically.

///

215.   The dangers of putting into the stream of commerce the **DEFENDANTS'** Products intentionally designed to cause addictive use, including by minors, that could potentially cause the laundry list of potential injuries arising from such addictive and disordered use of the Products, far outweigh the benefit of the addictive design features incorporated into the Products themselves.

216.   The **DEFENDANTS** knew or should have known that their Products posed a risk of causing severe injuries to users, particularly minor users, at the time the Products were designed, development, manufactured, distributed, and sold. Ordinary consumers would not have, and could not have, recognized those potential risks.

217.   The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors, including Plaintiff X.E. herein, and those similar situated. Plaintiff, for the sake of example and by way of punishing said **DEFENDANTS**, seek punitive damages according to proof.

218.   WHEREFORE, Plaintiff prays judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

## **Second Cause of Action: Negligence**

### **(Negligent Design and Negligent Failure to Warn)**

219.   Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

220.   The **DEFENDANTS**, as business owners, owed to Plaintiff a duty to act as a reasonably careful company would under the circumstances.

221.   The **DEFENDANTS** owed Plaintiff and the consumer public a duty of due care to place into the stream of commerce their Products in a manner and condition that Plaintiff X.E. could use them in a safe and non-dangerous manner.

222.   The **DEFENDANTS**, in their capacities as designers, developers, assemblers, manufacturers, packagers, labelers, suppliers, marketers, sellers, and in patenting, licensing and otherwise distributing and placing into the stream of commerce, their Products for personal use throughout the United States, including consumers in Florida, and specifically to minors and their caregivers in Florida, and specifically to Plaintiff herein, the **DEFENDANTS** owed a duty to exercise

ordinary care in so doing regardless of the specific participatory activity each engaged in, including a duty to warn consumers of the foreseeable risks and dangers of the Products that the **DEFENDANTS** knew were present but not obvious or known or knowable to users, especially underage users, or their caregivers, or any average member of the consuming public.

223.    The **DEFENDANTS**, in addition, owed a heightened duty of care to minors who use the Products at issue, specifically including Plaintiff X.E., because minors' brains are not fully developed which results in their diminished capacity to make healthful positive decisions regarding use of the Products, eschew self-destructive behaviors, and overcome the compulsion and desire to use the Products more and more despite experiencing negative and destructive short-term and long-term consequences from that use, whether physical, mental, or emotional, and despite restrictions and instructions from adults to not use the Products.

224.    The **DEFENDANTS** knew or should have known, were aware or should have been aware, of the catastrophic risks and dangers their Products posed to users thereof when used in a reasonably foreseeable manner. The **DEFENDANTS** knew of the dangers and risks posed by their Products because the Products were intentionally designed with addictive features to cause compulsive use. The **DEFENDANTS** knew of the severe dangers use of their Products posed to minors who used them, but nevertheless continued to place said Products into the stream of commerce, including into the hands of Plaintiff herein, without the general consumer public nor Plaintiff individually having any knowledge, or suspicion, or any reason to know or suspect, of the defects and unreasonable dangers posed to the users of said Products.

225.    The **DEFENDANTS** invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff X.E.'s use of the Products.

226.    The **DEFENDANTS**, and each of them, breached the duty they owed to Plaintiff X.E., a foreseeable user of their Products, by failing to meet the standard of care: the **DEFENDANTS** failed to exercise reasonable care in their own activities and thereby created a risk of harm to Plaintiff that could have been and in fact was reasonably anticipated and did in fact cause their injuries.

227.    Upon information and belief, the **DEFENDANTS**, and each of them, breached their duties to Plaintiff by failing to exercise ordinary care and due diligence in negligently placing into the

stream of commerce the Products used by Plaintiff X.E. in that the Products could not be operated in a safe and non-dangerous manner and instead posed risks of severe injuries and harm and were unreasonably dangerous as designed.

228.   A reasonably prudent or careful company would protect X.E. from unreasonable risk of injury from their use of their Products, yet each of the **DEFENDANTS** did not do that.

229.   A reasonably careful entity would not create an unreasonable risk of harm from the use of its Products (including an unreasonable risk that use could result in the development of an addiction or compulsive disordered use of the Products that could cause brain damage, suicidal ideation, sleep deprivation, anxiety, depression, or other physical, mental, and emotional injuries), yet each of the **DEFENDANTS** did just that.

230.   The **DEFENDANTS** are and were negligent and careless in that they failed to exercise ordinary care and caution for the safety of users of their Products, particularly underage users like Plaintiff X.E.

231.   Upon information and belief, the **DEFENDANTS**' activities and omissions as alleged herein contributed in natural and/or continuous sequence to serve as a substantial factor in causing the Plaintiff's injuries. At all times mentioned herein, the **DEFENDANTS**, through their negligence as alleged herein, ignored their responsibilities to Plaintiff and unreasonably jeopardized the health and well-being of Plaintiff and caused Plaintiff's injuries as alleged. Further, in light of the potential and actual risk of catastrophic harm associated with using the Products at issue, especially minor users, and particularly with respect to neurodivergent minors, a reasonable person or entity which had actual knowledge of the potential and actual risk of harm would have concluded that the Products should not have been marketed, sold, or distributed in the condition they were, i.e., designed with intentionally addictive qualities, and without a warning of the risks of dangers they posed.

232.   Upon information and belief, the Products the **DEFENDANTS** placed into the stream of commerce are defective because they are designed to be addictive to users, particularly minor users, and which causes users and their caregivers to suffer life-altering physical, mental and emotional injuries arising from the addictive and disordered use, including brain damage, attention disorders, severe depression, morbid obesity, and other injuries extremely dangerous to the health and welfare of

children. Plaintiff X.E. is amongst that group of injured minors in that X.E. suffers from video game addiction, as well as the other injuries herein identified proximately caused from using the Products that were designed, without warning, to be addictive.

233.   Upon information and belief, the **DEFENDANTS** negligently failed to include a warning, an inadequate warning, an instruction, or an inadequate instruction, of and/or regarding the herein identified risks and dangers of using the Products here at issue, including risks posed to minors who use the Products, in their intended and foreseeable manner, and despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care, should have known, that said Products were intrinsically defective and inherently and unreasonably dangerous and that minors who used them were likely to suffer severe injuries.

234.   Upon information and belief, the **DEFENDANTS'** Products were and are defective due to the **DEFENDANTS'** negligence in testing those Products.

235.   The **DEFENDANTS** are and were negligent in failing to allow independent academic researchers to adequately study the effects of the Products and levels of overplay and overuse by minors. The **DEFENDANTS** are alternatively and/or additionally negligent in that they ignored studies performed by independent academic researchers demonstrating that use and overuse of the Products at issue resulted in severe and several negative physical and mental and emotional injuries to minors.

236.   The **DEFENDANTS** knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental and emotional injuries and, further, knew that caregivers of such minors were ignorant of and had no reason to know of and which they would in any event be helpless to effectively or meaningfully monitor and/or prevent.

237.   Due to the **DEFENDANTS'** negligence as herein alleged, the Products used by Plaintiff X.E. were defective and unreasonably dangerous when put into the stream of commerce by the **DEFENDANTS**, and **DEFENDANTS** are liable for the injuries arising from their negligence in placing said defective Products into the stream of commerce without adequate warning or instruction regarding the dangers those Products posed to users, specifically to minors.

238.    The **DEFENDANTS** are and were negligent in failing to fully assess, investigate, and restrict the use of their Products, all to Plaintiff's detriment as alleged herein.

239.    The **DEFENDANTS** are and were negligent in failing to provide users who are minors, and their caregivers, the tools to ensure said Products are used in a limited and safe manner by underage users, all to Plaintiff's detriment as alleged herein.

240.    A reasonably careful company would not invite, encourage, or facilitate minors, such as Plaintiff X.E., to engage in dangerous behavior through, or as a reasonably foreseeable result of, using its Products; yet each of the **DEFENDANTS** did just that by inviting, encouraging, and facilitating minors to use their Products.

241.    The **DEFENDANTS** are and were negligent in failing to provide adequate warnings about the dangers associated with the use of their Products and in failing to advise users and their caregivers about how and when to use those Products, or any other parameters to follow, in order to ensure safer use of the same.

242.    The **DEFENDANTS** breached their duties to provide timely and adequate warnings, instructions, and information, at least in the following particulars:

    a.   negligently failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous and adequate, despite having extensive knowledge of the risks associated with their use;

    b.   negligently failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

    c.   negligently failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to, among other things, the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities, including but not limited to disordered and addictive behaviors such as withdrawal symptoms, brain damage, dissociative behavior, social isolation, damage or negative consequences to and/or cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects; and

d. negligently representing that the Products were and are safe for use, when in fact, the **DEFENDANTS** knew or should have known that said Products were designed to cause minors to overplay them until they developed an addiction or disordered compulsion to use the Products, and as such are and were actually unreasonably dangerous for use when operated as was foreseeable and intended by the **DEFENDANTS**.

243. Moreover, the **DEFENDANTS** breached their duty of care owed to Plaintiff through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective Products. Those breaches include:

a. utilizing information obtained in violation of state and federal laws to design the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

b. failing to implement effective protocols to block users under the age of 13;

c. failing to implement effective parental controls;

d. failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of Products by minors, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

e. failing to implement reasonably available means to monitor for and limit or deter excessive overplaying and overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions;

f. failing to implement reasonably available means to limit or deter use of Products by minors during ordinary times for school or sleep; and

g. failing to implement reasonably available means to set up and operate its Products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage users who are minors.

244. A reasonable company under the same or similar circumstances as each of the **DEFENDANTS** would have developed, set up, managed, maintained, supervised, and operated its

Products in a manner that is safe or at the very least more safe and protective of users, especially minors like Plaintiff X.E., yet none of the **DEFENDANTS** did this and thereby breached the duty they owed to Plaintiff herein.

245.   As a result of the **DEFENDANTS'** negligence, Plaintiff X.E. suffered and continues to suffer physical and mental injuries, including video gaming addiction,  cognitive impairment, preoccupation or compulsion with using the Products, withdrawal symptoms when use of the Products is removed or limited, including aggression and sadness, prioritizing gaming over other activities, deceiving family members about the amount of time using the Products, sharp decline in grades during height of use of Products, lack of friends with an inability and/or significant challenge to socially interact with peers as well as diminished social interaction with family members, behavior problems at school stemming from an inability to communicate.

246.   The **DEFENDANTS'** negligence, via the herein described and alleged breach of the duty of care each owed to Plaintiff herein, was a substantial factor in causing the harm, injuries and damages Plaintiff has sustained from their foreseeable and intended use of their Products. Each of the **DEFENDANTS'** breach of one or more of its duties was a proximate cause of Plaintiff X.E.'s injuries and the damages in that each of the **DEFENDANTS'** Products incorporated addictive design features that caused and contributed to harm and damages to users of the Products who were minors, including Plaintiff X.E.

247.   The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors, including Plaintiff X.E. and those similar situated. Plaintiff, for the sake of example and by way of punishing the **DEFENDANTS**, seek punitive damages according to proof.

248.   WHEREFORE, Plaintiff prays judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### Third Cause of Action: Negligence

### (Common Law Negligence)

249.   Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

250.   At all times material hereto, the **DEFENDANTS** had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including Plaintiff X.E.

251.   At all times material hereto, the **DEFENDANTS** owe a heightened duty of care to minors who are users of their Products because minors' brains are not fully developed which results in a diminished capacity to make mindful, healthful, decisions regarding their use of the Products here at issue.

252.   As product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, and into the hands of the Plaintiff herein, the **DEFENDANTS** owed a duty to exercise ordinary care in placing the Products into the stream of commerce, including a duty to warn users of the hazards of using their Products, hazards the **DEFENDANTS** knew to be present in their Products that were not obvious to users, and particularly not obvious to minor users.

253.   As business owners, **DEFENDANTS** owed the users of their Products, including Plaintiff herein, from whom they collectively derive billions of dollars per year in microtransactions and initial purchases, a duty of ordinary care to act as a reasonably careful company would under the circumstances.

254.   As "persons" under the law, the **DEFENDANTS** owed a duty to all consumers to exercise ordinary care and act as a reasonably careful company would under the circumstances, including following state and federal law.

255.   The **DEFENDANTS**, in their capacities as designers, developers, assemblers, manufacturers, packagers, labelers, suppliers, marketers, sellers, and in patenting, licensing, and otherwise distributing and placing into the stream of commerce, the Products to consumers for personal use throughout the United States, including consumers in California, and specifically to minor consumers and their caregivers in California, and specifically to Plaintiff herein, owed a duty to exercise ordinary care to effectuate placing the Products into the stream of commerce, including a duty to warn of the foreseeable risks of using the **DEFENDANTS**' Products that the **DEFENDANTS** knew were present buy which were not obvious or known or knowable to underage users and in the

case of minor users, their caregivers, so that the Products could be used in a safe and non-dangerous manner.

256. The **DEFENDANTS** were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of the users of their Products, and particularly underage users such as Plaintiff X.E.

257. The **DEFENDANTS** were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to study the effects of the Products and levels of problematic use amongst users who were of minor age. The **DEFENDANTS** knew and know that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use that their caregivers are helpless to meaningfully or effectively monitor and prevent.

258. The **DEFENDANTS** were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents and/or caretakers of users who are minors, including Plaintiff X.E., about how and when, if ever, to safely use their Products.

259. The **DEFENDANTS** were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including Plaintiff X.E., the tools to ensure that their Products are used in a limited and safe manner.

260. As a result of the **DEFENDANTS'** breach of the herein identified duties and resulting negligence, Plaintiff suffered severe physical and mental harm and economic damages from their use of the **DEFENDANTS'** Products.

261. The **DEFENDANTS'** conduct in breaching their duty to care to Plaintiff as herein alleged was a substantial factor in causing harm to Plaintiff X.E. and is both the actual and proximate cause of said harm.

262. As a direct and proximate result of the **DEFENDANTS'** breach of one or more of the herein identified duties of care owed to Plaintiff, Plaintiff was injured, harmed, and damaged as herein alleged.

///

263.   The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors, including Plaintiff X.E. herein, and those similar situated. Plaintiff, for the sake of example and by way of punishing **DEFENDANTS**, seek punitive damages according to proof.

264.   WHEREFORE, Plaintiff prays judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### Fourth Cause of Action: False Representation

### (Restatement of Torts, Section 402-B)

265.   Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

266.   At the aforementioned time when the **DEFENDANTS**, and each of them, researched, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, sold, tested or failed to test, inadequately warned or failed to warn, and failed to provide adequate use instructions for minimizing the risks inherent in the use of their defective and unreasonably dangerous Products, and otherwise placed into the stream of commerce those Products, the **DEFENDANTS**, and each of them, expressly and impliedly represented to members of the general public, including the purchasers and users of their Product, specifically including the Plaintiff herein, that the Products were of merchantable quality, and safe for the use for which was foreseeable and intended.

267.   The purchasers and users of the Products relied upon said representations of the **DEFENDANTS** in their selection, purchase, and decision to allow Plaintiff X.E., a minor, to use the Products as was reasonably foreseeable and for their intended purpose.

268.   The herein identified representations by the **DEFENDANTS**, and each of them, were false and untrue. The **DEFENDANTS** knew at the time they were made that they were untrue because the Products were designed to create addictive and disordered use in users, particularly in minors, and as such were not safe for their intended and foreseeable use, nor were they of merchantable quality as represented by the **DEFENDANTS** in that the use of the Products posed catastrophic risk of harm: the Products, as designed, and without warning, were intended to cause or

create addictive use that can cause a myriad of physical, mental, and emotional injuries and disorders, including withdrawal symptoms, brain damage, dissociative behavior, social isolation, damage or negative consequences to and/or cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects and damage to the caregivers of users.

269.   As a direct and proximate result of the herein alleged false representations made by the **DEFENDANTS**, and each of them, Plaintiff X.E. did develop disordered use of the Products and Plaintiff did sustain resulting harm, injuries, and damages as a result of that disordered use.

270.   The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors, including Plaintiff X.E., and those similar situated. Plaintiff, for the sake of example and by way of punishing said **DEFENDANTS**, seek punitive damages according to proof.

271.   Wherefore, Plaintiff prays judgment against the **DEFENDANTS**, and each of them, as hereinafter set forth.

### Fifth Cause of Action: Intentional Tort

### (Fraudulent Deceit, Deceit, Concealment - Cal. Civil Code Sections 1708-1710)

272.   Plaintiff realleges and incorporates by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here (excepting those pertaining exclusively to negligence).

273.   At all times pertinent hereto, the **DEFENDANTS**, and each of them, owed Plaintiff a duty, as provided for in Section 1708 through 1710 of the Civil Code of the State of California, to abstain from injuring the person, property or rights of Plaintiff. When a duty to act was imposed, as set forth herein and as pursuant to Section 1708, the **DEFENDANTS**, and each of them, did acts and omissions in violation of that duty, thereby causing injury to Plaintiff as is more fully set forth herein. Such acts and omissions consisted of acts falling within Section 1709 (Fraudulent / Intentional Deceit) and Section 1710 (Deceit and Concealment) and, more specifically, included suggestions of fact which were not true and which **DEFENDANTS,** and each of them, did not believe to be true at that time made, and had no reasonable ground for believing to be true at the time they were made. In addition, the **DEFENDANTS** caused certain facts they knew or should have known to be true and

which they had a duty to disclose to Plaintiff, and those similarly situated as Plaintiff, to be suppressed and concealed, all as has been previously alleged herein. Said acts and omissions of the **DEFENDANTS**, with respect to disclosing and concealing certain facts regarding the dangers of the Products as herein alleged, each constitute a violation of the **DEFENDANTS'** duties to act with respect to Plaintiff and thereby gives rise to a cause of action for the violation of the rights of Plaintiff as provided for in the aforementioned sections of the California Civil Code.

274.    Upon information and belief, prior to the date of initial development of the defective Products, the **DEFENDANTS**, and each of them, knew and possessed the true facts of medical and scientific data and other knowledge which clearly indicated that the design of the video game products could cause compulsive, addictive, and disordered use that was hazardous to the health and safety of users of the Products and specifically minors, and particularly minors with neurodivergent tendencies, and which would cause injuries and damage to the caregivers of the users of the Products, specifically including Plaintiff herein. With the intent to deceive Plaintiff and those similarly situated and in Plaintiff's position, and with the intent that Plaintiff and such others should be and would stay ignorant of such facts and with the intent to induce Plaintiff and such others to alter their positions to their injury and/or risk, and in order to gain advantages, the following acts occurred, all upon information and belief:

a.    The **DEFENDANTS**, and each of them, did not label any of the aforementioned Products with respect to the dangers they posed to the health and safety of users, including minor users, including Plaintiff and others in Plaintiff's position and, to date, still have not labeled any of the Products with a warning or instruction regarding the dangers of using them, Products that the **DEFENDANTS** know are unreasonably dangerous because they are designed to cause compulsive, addicted, and disordered use which in turn can cause a myriad of potential physical, mental, and emotional injuries to users. By resolving to not label such Products with respect to their known risks and hazards, especially with respect to those posed to minors, the **DEFENDANTS**, and each of them, caused to be suggested as a fact to Plaintiff and others similarly situated and in their position, that it was and is safe for people including minors to use, including Plaintiff X.E., the Products when in

fact it was and is not true and the **DEFENDANTS**, and each of them, did not, do not, and never did believe that to be true;

b. The **DEFENDANTS**, and each of them, suppressed and concealed information relating to the dangers using the Products pose to users, particularly minor and those with neurodivergent qualities, by requesting and agreeing amongst themselves to suppress and conceal said information to the general public, inherently including to Plaintiff herein, concerning the dangerous nature of their Products and thereby precluding such information from being disseminated in a manner which would give general notice and knowledge to the public of the dangerous qualities of the Products when the **DEFENDANTS** were bound to disclose such information; and

c. The **DEFENDANTS**, and each of them, distributed, designed, sold and otherwise placed into the stream of commerce the Products to the parents and guardians of minors, specifically to the parents and caretakers of Plaintiff X.E., herein, without advising those persons and/or others similarly situated of the addictive dangers using their Products posed to minors when each of the **DEFENDANTS** knew of such dangers, and had a duty to disclose such dangers.

275. By said conduct, the **DEFENDANTS**, and each of them, caused to be positively and proactively asserted to Plaintiff facts, and suggestions of fact, which were not true and which the **DEFENDANTS** had no reasonable ground for believing to be true – to wit, that it was safe and not addictive or otherwise dangerous for people to use the Products, and that it was safe for minors to use the Products **DEFENDANTS** placed into the stream of commerce, and into Plaintiff's hands.

276. By intentionally representing that which was false, i.e., that the Products were safe for use when used in a reasonably foreseeable manner and for their intended purpose, including by minors, the **DEFENDANTS** engaged in reckless representations without regard for the falsity of said representations and without regard for what they knew to be true about the addictive design features incorporated into the Products and the injuries and harm that the use of those Products could and did cause and which indeed were caused to Plaintiff herein.

///

277. The **DEFENDANTS**, and each of them, intended for Plaintiff and others similarly situated, to rely upon their intentionally and knowingly made false representations, concealment, suppression, and deceit as herein alleged.

278. Plaintiff reasonably relied upon said **DEFENDANTS'** intentionally false, deceitful, and reckless representations and concealment as herein alleged, all to the extreme detriment of Plaintiff.

279. Plaintiff's reliance on the **DEFENDANTS'** intentionally false, deceitful, reckless misrepresentations and acts of concealment of the risks of dangers their Products posed to the people who used them, particularly minors who used them, as herein identified, was a substantial factor in causing Plaintiff's injuries and damages.

280. The **DEFENDANTS** concealed and suppressed the fact that the Products were intentionally designed and sold with addictive features which they knew or should have known posed severe health and safety hazards to users, particularly users who are minors, to whom they were marketed and sold, and **DEFENDANTS** had a duty to disclose said material facts to consumers, including Plaintiff herein; the **DEFENDANTS** intentionally concealed and suppressed said material fact with the intent to defraud and deceive and conceal from Plaintiff the dangers of their Products by causing adults to allow X.E. to initiate using the Products at the young age of eight (8) years old in reliance on their false representation that the Products were safe to use and posed no health risks.

281. Plaintiff was unaware and did not know of said material facts and would not have acted as they did if they had known of the concealed and/or suppressed material facts. Plaintiff was injured and damaged as herein alleged as a direct and proximate result of the **DEFENDANTS'** concealment and suppression of said material facts and/or misrepresentation of material information specific to the dangers and risks posed by the **DEFENDANTS'** Products.

282. The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors, including Plaintiff X.E. herein, and those similar situated. Plaintiff, for the sake of example and by way of punishing said **DEFENDANTS**, seek punitive damages according to proof.

283. WHEREFORE, Plaintiff prays judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### REQUEST FOR PUNITIVE DAMAGES

284.  Plaintiff realleges and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

285.  Plaintiff is entitled to punitive damages because the actions of the **DEFENDANTS** as described and alleged herein were malicious, wanton, willful, or oppressive or were done with reckless indifference to Plaintiff and the public's safety and welfare. The **DEFENDANTS** misled Plaintiff, other users and/or purchasers of the Products, as well as the public at large, inherently including Plaintiff, by making false representations, and misrepresentations by way of omission, about the safety and risks associated with their Products. The **DEFENDANTS** downplayed, understated, concealed, suppressed and/or disregarded the fact that they knew or should have known that their Products posed severe, potentially catastrophic, permanent injuries and risks associated with the foreseeable use thereof.

286.  With the execution and exercise of reasonable diligence, the **DEFENDANTS** were or should have been in possession of information and evidence demonstrating that their Products posed a risk of causing a myriad of severe if not catastrophic injuries to the users thereof, particularly minors, but **DEFENDANTS** nevertheless participated in placing said Products into the stream of commerce and into Plaintiff's hands.

287.  The **DEFENDANTS** continue to place their Products into the stream of commerce via the provision of false and misleading information, and/or by omitting to disclose or disseminate vital information, regarding the unreasonably dangerous nature of their Products and the risks the operant conditioning and other addictive design features incorporated into the Products pose to users thereof, and specifically to minors. The addictive design and absence of a warning of known or knowable risks of danger posed by using the Products is a substantial factor in causing users to develop addicted or disordered gaming behaviors which in turn cause catastrophic and/or permanent injuries such as a gaming disorder diagnosis, damage to the prefrontal cortex causing lower cognitive function and an inability to regulate impulse control, as well as other negative effects such as attention disorders, verbal memory deficiencies, sleeping disorders in addition to other physical, mental, and emotional

disorders that cause serious harm to the safety and well-being of the users of the Products, just like the injuries that were caused thereby to Plaintiff X.E. as alleged herein.

288.   Upon information and belief, all times relevant to the injuries and allegations pleaded herein, the **DEFENDANTS**, before, during, and after their participation in placing into the stream of commerce the Products were aware of the dangers and risks posed by those Products and could have either designed the games differently so as to minimize or preclude and prevent the risks they posed to users and, in addition and/or in the alternative, could have provided a warning conveying the dangers and risks posed by the foreseeable use of the Products to the consuming public and users of the Products, Plaintiff among them.

289.   Despite that awareness, the **DEFENDANTS** consciously and purposefully decided against the above-described measures via a disclosure or warning, and instead chose to gamble with the safety of the public, specifically minors whose brains are not fully developed who are most vulnerable and susceptible to the risks posed by the Products.

290.   Furthermore, upon information and belief, the **DEFENDANTS**, upon becoming aware of the inherent dangers and risks posed by the Products, and learning and/or otherwise knowing of safer practical alternate designs and the need and propriety of providing a warning to the consumer public of the known or knowable dangers of the Products, the **DEFENDANTS** failed to recall the Products or retrofit the Products with a safer design, and also failed to adequately warn the public about the risks and dangers the Products posed to users, especially minors.

291.   The **DEFENDANTS**' actions as described above were performed willfully, intentionally, and with a conscious disregard for the rights, health, and safety of Plaintiff and the consumer public. Accordingly, Plaintiff seeks and is entitled to punitive damages in an amount to be determined at trial.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against the **DEFENDANTS**, and each of them as appropriate to each and every cause of action alleged and as appropriate to the particular standing of Plaintiff, as follows:

1.   For Plaintiff's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2.    For Plaintiff's past and future economic and special damages according to proof at the time of trial;

3.    For Plaintiff's medical and related expenses according to proof at the time of trial;

4.    For Plaintiff's prejudgment interest according to proof, pursuant to California Civil Code § 3291 at the time of trial;

5.    For Plaintiff's costs of suit herein;

6.    Injunctive relief;

7.    Attorney's fees;

8.    For exemplary and/or punitive damages according to proof at the time of trial; and,

9.    For such other and further relief, whether at law or in equity, to which this Court deems just and proper.

Date: September 24, 2025

**BULLOCK LEGAL GROUP LLC**

Anya Fuchs, Esq.

**HILLIARD LAW**

*/s/ Robert C. Hilliard*
Robert C. Hilliard, Esq.
Alex Hilliard, Esq.
Bonnie Rickert, Esq.

*Attorneys for Plaintiff,*
*X.E., a minor*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury as to all of their claims so triable.

Date: September 24, 2025

**BULLOCK LEGAL GROUP**

Anya Fuchs, Esq.

**HILLIARD LAW**

*/s/ Robert C. Hilliard*
Robert C. Hilliard, Esq.
Alex Hilliard, Esq.
Bonnie Rickert, Esq.

*Attorneys for Plaintiff,*
*X.E., a minor*

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON    9/24/2025
By    /s/ Carl Saffold
**Deputy Clerk**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ROBLOX CORPORATION; and the FIRST DOE through ONE HUNDREDTH DOE, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
RICKELL MATHEWS, as Guardian ad Litem and on behalf of X.E., a minor

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

  You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

  There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

  Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

  Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* SAN MATEO - Southern Branch

Hall of Justice and Records - 400 County Center, Redwood City, CA 94063

CASE NUMBER:
*(Número del Caso):*
**25-CIV-07479**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Anya Fuchs, Esq., BULLOCK LEGAL GROUP LLC, 2000 Powell Street, Suite 825, Emeryville, CA 94608

DATE:
*(Fecha)*  9/24/2025    Chad L. Peace    Clerk, by    /s/ Carl Saffold    , Deputy
*(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)           ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*